UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Jessica Lorraine Thompson

    v.                                Civil No. 12-cv-220-JL
                                        Opinion No. 2012 DNH 042

Chad Paul Gnirk

## FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR JUDGMENT

This is a case between unmarried parents over which nation's courts should decide the custody of their child.  The question before the court is where--the United States or Canada--the child has been "habitually resident" under Article 3 of the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention").[1]  The petitioner, Jessica Lorraine Thompson, claims that the respondent, Chad Paul Gnirk, has wrongfully retained custody of their 3-year old daughter, J.G., in breach of Thompson's rights under the laws of Canada, where she says J.G. was habitually resident at the time of the alleged wrongful retention, and seeks J.G.'s return.  Gnirk maintains that, at that point, J.G. was habitually resident in the United States, so that, under Article 3 of the Hague Convention, his custody rights under American law, rather than Thompson's custody rights under Canadian law, govern.

-----

[1]International Child Abduction Convention Between the United States of America and Other Governments Done at the Hague October 25, 1980, T.I.A.S. No. 11670.

This court has subject-matter jurisdiction under 42 U.S.C. § 11603(a), part of the federal statutory scheme that serves to implement the Hague Convention in the United States, see id. § 11601(b)(1). After denying Thompson's motion for an ex parte temporary restraining order awarding her custody of J.G. pending resolution of this action on the merits, Order of June 15, 2012, this court approved the parties' joint proposal for an expedited discovery and trial schedule, Order of June 22, 2012, and their subsequent joint motion to extend that schedule, Order of July 9, 2012. The court conducted a bench trial on the merits over the course of August 2 and 3, 2012.

Prior to the bench trial, at the court's direction, the parties jointly submitted a statement of agreed-upon facts and a timeline of events, Order of June 22, 2012, and each party submitted requests for findings of fact and rulings of law, see L.R. 16.2(b)(2). At trial, each party submitted a number of exhibits and testified on his or her own behalf, and Thompson called two other witnesses as well. Due to complications from her current pregnancy, Thompson was unable to travel to the courthouse to testify or otherwise participate in the proceedings, so, by agreement of the parties, she did so via videoconference from the office of her counsel in British Columbia, while her American counsel was present in the courtroom to conduct her case.

Based on the evidence received at trial, and with the assistance of the parties' submissions and presentations, the court makes the following findings of fact and rulings of law. See Fed. R. Civ. P. 52(a). As explained in detail infra, this court finds and rules that J.G. was habitually resident in the United States as of August 25, 2012, when Gnirk's allegedly wrongful retention of custody of her began, so that Thompson's petition for relief under the Hague Convention must be denied.

The court finds that, prior to that point, Thompson, Gnirk, and J.G. had lived together in the United States (first in Maine, and then in New Hampshire) from early December 2009 to late May 2011--a period interrupted only by two visits that Thompson and J.G. made to Canada to see Thompson's family, and, finally, when Thompson and J.G. returned to Canada following the breakup of the parties' romantic relationship. The circumstances of this cohabitation strongly suggest the parties' "shared intent or settled purpose" that J.G. reside in the United States and, therefore, that her habitual residence was in the United States as of the alleged wrongful retention. Nicolson v. Pappalardo, 605 F.3d 100, 103-04 (1st Cir. 2010).

Against this powerful objective proof, Thompson has offered two principal theories that J.G. was in fact a habitual resident of Canada. These theories are seemingly in serious tension with each other, and are ultimately unsupported by any credible

evidence as well.  First, in Thompson's testimony, she repeatedly described the time she and J.G. spent with Gnirk in the United States as merely "visiting," while Thompson's parents' house in Canada remained "home" to her and J.G.  This description cannot be squared with either the length or the nature of Thompson's and J.G.'s time in the United States.  Second, in his closing argument at trial, Thompson's counsel ventured that the American cohabitation was merely a "trial period," so that it did not in fact reflect any "settled intent" that J.G. leave her native Canada to take up residence in the United States.  This theory is also hopelessly at odds with the objective evidence and, for that matter, Thompson's own testimony (which, again, was not that J.G. had accompanied her to the United States for a "trial period" of living together with Gnirk, but for "visits.")  As fully explained below, then, the court rejects these post hoc characterizations of the parties' actions and intentions prior to Gnirk's alleged wrongful retention of J.G. and finds that, by that point, she was habitually resident in the United States.

## **Findings of Fact**

1.   In late February 2007, when Thompson was 19 years old, she met Gnirk at a pub in Sidney, British Columbia, where she was working as a waitress.  At that point, Thompson still lived with her parents in their home at 1900 Dickson Avenue in Sidney, where she had grown up.  Both sets of Thompson's grandparents, as well

as various aunts, uncles, and cousins, live in the area and
regularly get together for family dinners and other visits.
Thompson is a Canadian citizen who has never sought citizenship,
or any other permanent legal status, in the United States.  Her
father is a full-blooded member of a "First Nations" tribe of
aboriginal Canadians, and the Canadian government has recognized
her own "Indian" status.

2.   When the parties met, Gnirk was around 34 years old and
had been living with a friend and intermittently working at a
restaurant in the Sidney area.  Also at this time, Gnirk was
separated from (but still married to) his wife, who lived,
together with their daughter, in British Columbia.  Gnirk has
always been a United States citizen and has never had any
permanent legal status in Canada.

3.   Thompson and Gnirk soon began a romantic relationship.
Thompson moved in with Gnirk at his friend's house.  In June
2007, Gnirk moved to Washington State to work as the finance
manager at a car dealership, and Thompson accompanied him.  They
initially lived together in a house that Gnirk rented, although,
after Gnirk was evicted from there, they lived elsewhere in the
area, including with one of Gnirk's friends.  Gnirk and Thompson
lived together in Washington State until June 2008.

4.   While Thompson made occasional trips to British
Columbia during this time, the court does not credit her

testimony that, after Gnirk moved to Washington State, she continued living with her parents in British Columbia and simply "visit[ed]" him there.  Throughout this time, Gnirk was financially supporting Thompson, who had not worked since March 2007, shortly after the couple had met.  Indeed, while Thompson was in Washington State with Gnirk, he bought her a car and a dog.  Moreover, as already stated, Thompson testified that she had been living with Gnirk even before he moved to Washington.

5.  In the spring of 2008, while living with Gnirk in Washington State, Thompson discovered that she was pregnant.  In June 2008, Thompson and Gnirk returned to British Columbia, where they initially lived in a structure outside the house of Thompson's sister and brother-in-law.[2]  After a brief time there, Thompson and Gnirk moved to a basement apartment they rented in Brentwood Bay, British Columbia, near Sidney.  Gnirk worked sporadically in a restaurant during this time.  He tried, but failed, to find work at a car dealership in the area, stumbling over the licensing and bonding requirements that he says Canada imposes on car salesmen.  Gnirk also explored the possibility of obtaining Canadian citizenship, which he discovered would prove

---

[2]The nature of this structure and its suitability for habitation were the subject of conflicting accounts by the parties at trial (and, indeed, even before that) but are ultimately of little consequence to the issues before the court.

difficult without a steady job.  Thompson testified that, in late August 2008, she and Gnirk were engaged to be married.

6.   On January 18, 2009, J.G. was born at a hospital in Victoria, British Columbia.  She was later issued a British Columbia birth certificate, a Canadian social insurance card, and (in April 2010, with Gnirk's consent) a Canadian passport.

7.   After J.G.'s birth, Thompson, Gnirk, and J.G. lived together for brief periods with both Thompson's parents and her sister, and also at a motel, before moving into an apartment in James Bay, British Columbia.  Gnirk's unsuccessful efforts at trying to find a job at a car dealership continued.  The couple had no savings.  Eventually, Thompson and Gnirk decided that he should return to northern New England, where he had grown up, and where members of his family lived, to try to secure employment.

8.   In October 2009, Gnirk moved to Berwick, Maine, where he initially lived at the home of his brother and his family while looking for work.  Shortly after the move, Gnirk accepted a job as the finance manager at a car dealership in Portland, Maine, but the job did not open up as anticipated, so the dealership allowed him to seek other employment.  Gnirk worked for a few weeks in December 2009 as the sales manager at another car dealership, in Lebanon, New Hampshire, and then began working for the dealership in Portland that had initially hired him.

9.   In early December 2009, while Gnirk was working at the dealership in Lebanon, Thompson and J.G. traveled to the United States, where they began staying with Gnirk.  The circumstances of this trip were the subject of conflicting testimony.  Thompson characterized the trip as a mere "visit," so that Gnirk could spend Christmas, and J.G.'s upcoming birthday, with her.  But Gnirk testified that--as he and Thompson had discussed prior to his own move to Maine--she and J.G. joined him there in December 2009 "to start a new life, get a home, settle down."

10.   On balance, the court finds Gnirk's account of the parties' plans to be more credible.  Thompson's account--that she and J.G. "would travel back and forth for a period that [Gnirk] would be living on the east coast until he was able to relocate back" to British Columbia--seems unrealistic in light of the parties' situation at that point.  The family's financial survival depended on Gnirk's earning potential,[2] which was severely limited in Canada due to his inability to find a job at a car dealership there (which, he explained, was due to licensing and bonding requirements, rather than any lack of experience). Thompson did not coherently explain how, in light of this dilemma, working for a period of time in the United States would have helped Gnirk find better employment in Canada in the future.

_____

[2]Jessica testified that she has completed only one year of high school, and her work experience at that point consisted of three months of waitressing.

11.   Thompson's grandparents, at least, believed that she and J.G. were moving to the United States to live with Gnirk.  In a 2009 Christmas card discussing goings-on in their lives (which was admitted by agreement as a full exhibit at trial), the grandparents wrote that she and J.G. had just been staying with them but that "We sure are going to miss them as she plans on flying to meet her partner Chad in Boston some time in the middle of Dec[ember].  Chad has just been offered a finance managerial job for a big Nissan dealership."

12.   Moreover, the parties' testimony as to their plans aside, their actions following Thompson's and J.G.'s travel to the United States in December 2009 strongly suggest an intent that they take up residence there, rather than that they simply "visit" and return.[3]  At some point after she arrived in the United States in December 2009, Thompson, with assistance from Gnirk, set about trying to find an apartment where she, Gnirk,

---

[3]Thompson testified that she left many of hers and J.G.'s possessions, including furniture, at her parents' home in British Columbia, while Gnirk testified that he and Thompson had sold nearly all of the furniture from their apartment in James Bay before he moved to Maine.  Regardless of how much furniture Thompson owned when she traveled to the United States in December 2009, the fact that she did not bring it (or, as she also testified, clothing that did not fit her or J.G. at the time) with her is unsurprising, in light of the fact that she traveled to the eastern United States by plane from Seattle.  It is reasonable to infer that, though she was moving to the United States so that she and J.G. could reside there, she simply left these non-essential items at her parents' house to avoid the hardship of transporting them herself, or the expense of having them shipped, to the United States.

and J.G. could live.  In or around June 2010, Thompson and Gnirk

co-signed a lease for an apartment in Westbrook, Maine.[4]

13.  Thompson acknowledged that she helped pick out the

furniture for this apartment and otherwise "set it up to make it

a home."  Gnirk recalled (and Thompson did not dispute) that she

selected a couch, a television, a washer and dryer, and furniture

for J.G.'s room, including a bed and a dresser.  Thompson

purchased these items with funds from Gnirk's checking account.

She also arranged for cable service at the apartment, with the

account in her name, and received mail there (though she also

continued receiving mail at her parents' house in Canada).

14.  In March 2011, Gnirk's employer offered him a promotion

to the job of sales manager at its location in Berlin, New

Hampshire, and Gnirk accepted.  Thompson, Gnirk, J.G., and their

dog stayed in a motel in the Berlin area for several weeks while

Thompson and Gnirk set about finding a more suitable place for

them to live.

----

[4]Thompson testified that she signed the lease because "I was
told that as an adult staying there I had to," presumably by the
landlord.  The court does not find this testimony credible.
First, it begs the question why Thompson did not simply explain
to the landlord that she was not in fact "staying" there, but was
merely "visiting," as she now says she was.  Second, as noted
infra, Thompson testified that she signed the lease for the
parties' second apartment in the United States because the
landlord there told her precisely the same thing.  This strikes
the court as highly unlikely and, moreover, Thompson's manner and
demeanor in delivering the testimony (again, using precisely the
same words) undermined her credibility on this point.

15.   On March 18, 2011, Thompson and Gnirk co-signed a lease for a single-family house in nearby Gorham, New Hampshire, The lease had a term of 18 months, and also gave Thompson and Gnirk the option to purchase the property.  Thompson was aware of both of these provisions when she signed the lease.  She claimed that she signed it because, just as happened with the parties' apartment in Maine, she "was told because I'm an adult and would be staying there that I had to sign the lease."  Again, the court does not credit this explanation.  See note 4, supra.

16.   Thompson signed the lease in a signature block for "Jessica Gnirk" (though she says she actually signed her name as "Jessica Thompson").  Around that time, though they were not married, both Thompson and Gnirk were introducing her to others as "Jessica Gnirk" and his wife and Thompson was referring to Gnirk as her husband.  While she was in Maine, in fact, Thompson had signed up for an on-line wedding registry.  Despite their engagement, and Thompson's registration for wedding gifts (at an American retailer), the parties never got married.

17.  When Thompson and J.G. first arrived in the United States in December 2009, Gnirk told his employer at the time that Thompson was his wife so that he could obtain health insurance for her under his employee benefit plan.  He also obtained health insurance for J.G. under that plan.  Since December 2009 or January 2010, Gnirk has provided health insurance for both

Thompson and J.G. (though he stopped providing health insurance for Thompson in or around May 2012 when their romantic relationship ended and, he says, his employer learned that they were not in fact married).

18.  Thompson and Gnirk moved all of theirs and J.G.'s furniture and other possessions from their apartment in Maine into the house in Gorham.  Thompson and Gnirk painted most of the rooms in the Gorham house, with paint colors selected by Thompson.  Thompson transferred the cable service she had ordered at the Maine apartment to the Gorham house.

19.  During their time in Maine and, later, New Hampshire, Thompson and J.G. would spend their days playing, shopping, and being outside (though Thompson found the northern New England climate, with its cold winters and hot summers, to be limiting). They would also "often," in Thompson's words, drive to visit Gnirk's mother and sister in Berwick, Maine.

20.  On March 16, 2010, before the move from Maine to New Hampshire, Thompson and J.G. traveled to British Columbia without Gnirk, and remained there until April 22, 2010, when they returned to the United States.  Thompson and J.G. also traveled to British Columbia, again without Gnirk, on July 13, 2010, returning to Maine on September 13, 2010.  During these periods, Thompson and J.G. stayed with her parents, and also at her grandparents' vacation camp.  They generally spent their time

socializing at the pool, park, and other locations with their
family and Thompson's friends.  J.G. received vaccinations and
other medical care during her time in British Columbia.

21.  Based largely on the facts just discussed, the court
cannot credit Thompson's characterization of these trips as her
and J.G.'s "return[ing] home" between "visits" to the United
States and, in fact, adopts the opposite characterization, i.e.,
having moved to the United States to live with Gnirk in December
2009, Thompson and J.G. were simply visiting her family in Canada
between mid-March and mid-April 2010, and again between mid-July
and mid-September 2010.

22.  Indeed, two people close to Thompson who concluded as
much were her grandparents, whom she visited during her time in
British Columbia in both early spring and late summer 2010.  As
already noted, Thompson's grandparents believed in late 2009 that
she and J.G. were moving to New England to live with Gnirk.  See
¶ 11, supra.  In addition, in their 2010 Christmas letter
(admitted without objection as a full exhibit), the grandparents
wrote that, during that summer, they "had lots of company
including visits from Jessica who now lives in Boston and spent a
couple of weeks with us with [J.G.]."

23.  Thompson's characterization of her time in the United
States as "visits" also clashes with the duration and timing of
her stays here.  First, while she testified that the purpose of

her December 2009 passage to the United States was so that she
and J.G. could spend Christmas and J.G.'s January 2010 birthday
with Gnirk, Thompson told him in an email before the trip that
she did not plan to return to Canada until May 2010.  As already
discussed, she ended up traveling back to Canada in March 2010,
but even that was months after she had accomplished what she now
says was the purpose of the December 2009 trip.  Second, Thompson
testified that, when she and J.G. traveled to the United States
again in September 2010, she had planned on returning to Canada
in either November 2010 or January 2011, but ended up staying
longer because, in November 2010, Gnirk underwent hip surgery and
was unable to care for himself.  It was undisputed, though, that
within six or seven weeks of the surgery, Gnirk had recovered to
the point where he was able to resume driving and working--yet
Thompson remained in the United States.  She did not return to
Canada, in fact, until several months later, when the parties
broke off their romantic relationship in late May 2011.[5]

      24.  Furthermore, this court finds that, on the whole,
Thompson did not come across as a credible witness, particularly
in characterizing the time she and J.G. spent in the United

---

      [5]Indeed, Thompson states in her proposed findings and
rulings that, following the surgery, Gnirk was "unable to drive
or care for himself for several weeks, taking more than a month
off from work," but no longer than that.  On questioning by the
court, Thompson explained that she remained in New Hampshire
beyond that point only to help Gnirk move to Gorham, but the
court does not find that explanation credible.

States and Canada between early December 2009 and late May 2011.
Thompson repeatedly described her travel to Canada in 2010 with
the canned phrase, "I returned to my home at 1900 Dickson Avenue,
Sidney, British Columbia," and resorted to self-evidently
strained explanations of the various documents (including the
leases, cable bills, and receipts from various retailers)
suggesting that she was in fact living in the United States
during this time.  See, e.g., note 4, supra.  Thompson's tone of
voice and demeanor also noticeably changed when she was giving
testimony she perceived as harmful to her case.  Perhaps most
telling, though, was the fact that--as noted supra and discussed
in more detail infra--Thompson's counsel essentially abandoned
her characterization of her time in the United States in his
closing argument at trial and chose instead to advance a starkly
different theory, i.e., that Thompson was here not to visit
Gnirk, but as part of a "trial period" where they were "trying to
make the relationship work."

        25.   In late April or early May 2011, the parties' romantic
relationship ended.  Around this time, Thompson had sex with
another man in the parties' house while Gnirk was at work, as she
later admitted to him.  Thompson testified that this event did
not occur until after she and Gnirk had "broken up."  There was
no evidence that the parties had previously agreed to end their
relationship (Thompson testified that they had begun sleeping in

different rooms several months earlier, but were still living together, while Gnirk said that did not happen until after the revelation) but ultimately this aspect of the chronology is unimportant.[6]  Gnirk reacted angrily to Thompson's revelation and, at least initially, believed their relationship was over.

26.   Nevertheless, Thompson and Gnirk (and J.G.) continued living together in the Gorham house until May 26, 2011, when, with Gnirk's consent, Thompson and J.G. traveled to British Columbia.  They initially stayed at Thompson's parents' house there.  Thompson and Gnirk talked frequently by telephone. Thompson asked Gnirk to send her money, which he did.

27.   The parties' understanding of their plans for J.G.'s custody as of her travel to Canada on May 26, 2011 was also the subject of deeply conflicting testimony.  Thompson recalled that, after the breakup but before traveling to Canada, she and Gnirk reached an agreement over dinner at a restaurant one night that J.G. would "return home to Canada with me as she always did and remain with me as her primary caregiver which had always been and she would then visit [Gnirk] in the states like she had always done before.  But instead of staying for longer periods of time since I would not be visiting with her, she would stay for

---

[6]Indeed, the only reason the court is making any findings on how the parties' relationship ended is to place Thompson's and J.G.'s subsequent travel to Canada in the proper context.  The court is not using these events to draw an inference as to either party's credibility.

shorter periods of time." Thompson also recalled that Gnirk
agreed to pay her $1,000 in monthly child support.

28.   The court cannot credit Thompson's testimony on this
point either.  As was the case with her other characterizations
of the parties' actions, see ¶ 24, supra, the agreement she
described--that Thompson and J.G. were to live in Canada while
J.G. made "visits" to Gnirk in the United States--was not at all
what the parties had "always done before."  To the contrary, as
just discussed at length, Thompson and J.G. had been living
together with Gnirk in the United States since early December
2009.  The agreement Thompson describes, then, would have
radically restructured J.G.'s life (as well as those of her
parents), and the court cannot believe that the parties, while
still in the throes of the dissolution of a five-year
cohabitative relationship, would have entered into such an
agreement so quickly and casually.

29.   Instead, the court finds Gnirk's account of the
parties' understanding as of late May 2011 to be more believable.
Gnirk testified that, after the break in his romantic
relationship with Thompson, he suggested

> a couple alternative paths that we could take, one
> being that we could rent her apartment locally and we
> could work through it or not work through it and still
> be in the same area to raise our child.  The other
> option was if she wanted to go back and visit her
> family and take some time to think about it I was a
> hundred percent fine and she decided to go with that
> option.

In short, the court finds that the parties, confronted by serious and difficult questions about J.G.'s future, as well as their own, decided only that Thompson and J.G. should return to Canada while the answers to those questions were worked out.

30.   This finding is also consistent with most (though not necessarily all) of the parties' actions following Thompson's and J.G.'s trip to Canada on May 26, 2011.[7]   Roughly one month later, on June 26, 2011, Thompson and Gnirk met in Seattle, where Gnirk took J.G. back to New Hampshire with him.   The circumstances of this transfer are also the subject of deeply conflicting testimony.   Thompson testified that, in line with her version of the parties' understanding that J.G. would continue "visiting"

---

[7]There was evidence that, on or around May 12, 2011, Gnirk sought to remove J.G. from his employee health insurance plan. This effort generated an email to Gnirk from his employer's controller stating:   "We will have to keep your daughter on the insurance until at least open enrollment which is July 1st . . . because her situation is not a qualifying event to have a child removed."   One reasonable inference to draw from this email is that Gnirk was seeking to have J.G. removed from his employee health insurance plan because he knew she was heading to Canada to live with Thompson on a long-term basis.   Gnirk testified, however, that he was trying to remove J.G. from the plan only because he knew rates were about to rise and wanted to find alternative insurance for her.   While this explanation is not entirely credible (among other things, it does not explain what the controller could have meant by reference to J.G.'s "situation"), there was no contrary evidence adduced, in the form of testimony from the controller or otherwise.   Moreover, it is undisputed that Gnirk continued to maintain health insurance for J.G. even after July 1 (which is when the controller told him he could have cancelled J.G.'s coverage).   On balance, then, the email does not seriously undermine the court's finding that the parties never reached agreement on J.G.'s long-term custody.

Gnirk, the parties agreed that J.G. would stay with him in New
Hampshire for two months, then return to live with Thompson in
Canada.  Gnirk, however, testified that Thompson had asked him to
take J.G., telling him that she "wasn't in a position at that
point in time" to have J.G. living with her because Thompson
"didn't have money, didn't have a job, [and] was unsure where she
would be living."  Gnirk further testified that, when he and
Thompson met in Seattle, they did not agree on any specific time
frame as to when J.G. would return to Thompson in Canada, but
"went back and forth from two months to three months" as a rough
period of time that Thompson would need to "get set up" with
housing and employment before J.G. would stay with her again.

    31.  Again, the court finds Gnirk's version of events more
believable.  As of June 26, 2011, when Thompson transferred J.G.
to Gnirk, only one month had passed since he had last seen her,
on May 26, 2011.  Before that, of course, J.G. had been living
with him (and Thompson) in New Hampshire for the previous 18
months.  In light of this chronology, it is difficult to accept
Thompson's proferred explanation for the transfer, i.e., that she
wanted J.G. to "visit" Gnirk because Thompson--as she states in
her proposed findings and rulings--"felt it was important for
J.G. to have a good relationship with her father."  At that
point, J.G. had only been physically separated from her father

for one of the prior eight months, and four of the prior eighteen
(during her trips to Canada with Thompson).

32.   Moreover, as Thompson repeatedly emphasized in her
testimony, she had never been physically separated from J.G. for
more than a night or two prior to June 26, 2011--yet, by her own
account, agreed that J.G. would be apart from her for at least
two months while "visiting" Gnirk.  Gnirk, for his part, had not
planned any time off from work to coincide with this lengthy
"visit" and had to hire a babysitter to care for J.G. while he
was at work during the day.  These are not the typical
circumstances of a child's "visit" to her non-custodial parent,
and they (together with the court's reservations about the
plausibility of Thompson's recollections in general) undermine
her testimony that she and Gnirk "agreed" that J.G. would stay
with Gnirk in New Hampshire for two months before returning to
live long-term with Thompson in Canada.

33.   Thompson also testified that, before she turned J.G.
over to Gnirk, he promised--at Thompson's insistence--to give her
a letter memorializing this alleged agreement, but, when he
arrived in Seattle, failed to do so, claiming that the letter had
been lost with his luggage.  To corroborate this testimony,
Thompson relied on a message Gnirk had sent her through her
Facebook account on the morning of June 26, 2011, stating:

> So the letter says she will be staying here for two
> months and that we will work out a permanent

> arraingement [*sic*] for child support being a thousand a
> month for her while she is there - but not with me and
> for a period of time that we agree upon you the same
> monthly support [*sic*] . . . .  its [*sic*] at work so i
> [*sic*] can't literally type word for word but thtas
> [*sic*] the guts of it[.]

Gnirk never gave any such letter to Thompson.

34.  Gnirk did not deny telling Thompson that he would

provide her with a letter, or that it had been lost with his

luggage.  He testified, however, that he understood that Thompson

wanted the letter to affirm his commitment to make support

payments to her, rather than any agreement that, following a two-

month visit with Gnirk, J.G. would return to live with Thompson

in Canada on an indefinite basis.  This explanation is not

completely satisfactory, but, regardless, the Facebook message is

ambiguous as to any agreement on where J.G. would live in the

future and, as such, does not call into serious question this

court's view that, when Thompson transferred J.G. to Gnirk on

June 26, 2011, the parties had no such agreement in place.

35.  The parties' subsequent behavior lends further support

to this view.  After returning to New Hampshire with J.G., Gnirk

hired a babysitter to care for J.G. while he was at work.  (When

that sitter proved irresponsible after a week or so, Gnirk fired

her and hired a different one.)  Thompson frequently communicated

with Gnirk by phone or text to see how J.G. was doing, and spoke

to J.G. by phone as well.  On July 29, 2011--in what appears to

be one of a series of text messages between the parties around

that time--Thompson wrote, "All I'm saying is I miss her and I don't think we can go <u>three</u> months.  I'm dying here.  I'm sure she misses me too" (emphasis added).[8]  This suggests that, contrary to Thompson's testimony, the parties had not already agreed that J.G. would stay with Gnirk for only <u>two</u> months.

36.  Indeed, in late August 2011, after Gnirk notified Thompson that he would not be sending J.G. back to Canada, Thompson does not appear to have invoked the parties' alleged agreement in any of her text messages with Gnirk.  More strikingly, she did not even mention it when, on August 25, 2011, she filed, through counsel, an ex parte application with the Supreme Court of British Columbia seeking an award of interim custody over J.G.

37.  At any rate, on August 25, 2011, the British Columbia court issued an order awarding Thompson interim sole custody of J.G. and directing Gnirk to return her to Thompson's care.  Gnirk learned of the order after Thompson faxed it to the Gorham Police Department and an officer brought a copy of it to Gnirk's home.[9]

---

[8]In quoting from the parties' text messages in this order, the court has taken the liberty of correcting the spelling and punctuation.

[9]There was conflicting testimony on how the police came to be involved:  Gnirk claimed that Thompson had accused him of molesting J.G., while Thompson denied that and described the officer's visit to Gnirk's home as a "wellness check."  No police report was offered by either party.  Because this factual dispute is ultimately immaterial to the issue of J.G.'s habitual residence, the court declines to resolve it.

38.   That same evening, Thompson sent Gnirk a series of text messages.  These messages including several asking Gnirk to call her, as well as others expressing warm feelings toward him and stating, "I want to come home" and "I want our picture perfect life back."

39.   Over the next several days, the parties continued to exchange text messages.  Thompson repeatedly asked Gnirk to send her money.  Gnirk, for his part, stood by his refusal to send J.G. to Thompson, telling her, "you don't have a home or a bed nor bureau for her, let alone a job.  How can you deny you aren't set up for this right now?  How long before you can find a place to live and a job so you can take care of her?  That would make it easier for me to relax on all of this."

40.   Thompson responded that she was making her home in the outbuilding at her sister's house, and that Gnirk could financially "support us like you have been for the past five years."  Thompson also suggested, "We can come to an agreement and have it signed by a judge."  Again, she never mentioned the agreement she now claims was already in existence at this point, at least in the text messages that were entered into evidence.[10]

---

[10]Gnirk's cellphone records showed a total of 183 text messages between him and Thompson during the period from August 23, 2012 to September 5, 2012.  Only 90 messages from that period, however, were produced by Gnirk in discovery and were entered into evidence at trial, in the form of screenshots from his cell phone.  Gnirk testified that these were messages he had "locked" so that they would not be automatically deleted by his

In later text messages, Thompson stated that she missed J.G.,
and, on multiple occasions, asked Gnirk to have J.G. call her.
Gnirk responded that he would try to arrange those calls, and it
appears that he did so.

41.   In the meantime, on August 26, 2011, Gnirk filed an ex
parte motion with the Berlin Family Division of the First Circuit
Court of New Hampshire, seeking to be temporarily awarded sole
decision-making and residential responsibility over J.G.  The
court granted that relief the same day.  On August 29, 2011,
Thompson filed an application with the British Columbia
authorities for relief under the Hague Convention.  In the Berlin
Family Division, she later filed a "Petition to Register a
Foreign Judgment," namely, the ex parte order awarding her
interim sole custody of J.G.

---

phone to make room for newer ones.  Gnirk's counsel also
represented that, after September 2012 but before the
commencement of discovery in this action, Gnirk's phone was
damaged so that he was unable to retrieve any more messages from
it and, while he had taken it to have it repaired, the repair had
yet to be completed.  Thompson's counsel represented that
Thompson no longer possessed the phone she had used to send
messages to Gnirk during the relevant time period.  Neither party
testified, or sought to elicit testimony from the other, as to
the content of any of the messages that had been sent but not
recovered.  Based on this state of affairs, the court does not
deem it appropriate to draw an inference against either party
based on the missing text messages and, indeed, neither party has
sought that relief.  The court is nevertheless mindful that the
text messages introduced into evidence do not represent the
entirety of the parties' electronic communications during late
August and early September 2011.

42.   The Family Division held a hearing on Gnirk's and
Thompson's petitions in November 2011.  Following the hearing,
which both parties attended with counsel, the Family Division
left its order granting temporary custody to Gnirk in place,
dismissed Thompson's petition to register the British Columbia
court's contrary order, and directed her to file a petition
requesting Hague Convention relief with the Family Division if
she wished to pursue it.

43.   In February 2011, the Family Division held another
hearing, for the purposes of considering whether it had
jurisdiction to determine custody of J.G. and, if so, what
further custody orders should issue.  Thompson attended the
hearing with counsel, but only to contest the Family Division's
jurisdiction; she refused to participate as to custody matters.
On March 23, 2012, the Family Division ruled that it had
jurisdiction to determine J.G.'s custody, and approved Gnirk's
proposed temporary parenting plan.[11]

44.   For its part, the British Columbia court later held a
series of hearings on Thompson's petition in April and May 2012.

---

[11]Prior to trial in this action, Gnirk filed a motion to
dismiss Thompson's petition on collateral estoppel grounds.  He
argued that the New Hampshire Family Division's ruling that it
had jurisdiction to decide J.G.'s custody precluded Thompson's
claim that J.G. was habitually resident in Canada.  Because this
court is ruling in Gnirk's favor on the merits of that claim, it
need not reach his issue preclusion argument, and denies his
motion to dismiss as moot.

Gnirk did not appear at any of them.  On May 10, 2012, the
British Columbia court awarded Thompson permanent sole custody
and permanent sole guardianship of J.G.

45.  Thompson commenced this action on June 12, 2012.

### Rulings of Law

A.    The stated purposes of the Hague Convention are "to
secure the prompt return of children wrongfully removed to or
retained in any" of the signatory nations, and "to ensure that
rights of custody and of access under the law of one [signatory
nation] are effectively respected in the other[s]."  Hague
Convention, Art. 1.

B.    As noted supra, the federal statutory scheme
implementing the Hague Convention in the United States allows
"[a]ny person seeking to initiate proceedings under the
Convention for the return of a child" to do so "by commencing a
civil action by filing a petition for the relief sought in any
court which has jurisdiction of such action and which is
authorized to exercise its jurisdiction in the place where the
child is located at the time the petition is filed."  42 U.S.C.
§ 11603(b).  That court must then "decide the case in accordance
with the Convention."  Id. § 11603(d).  Importantly, it is the
petitioner bringing such an action who has the burden "to
establish by a preponderance of the evidence in the case of an
action for the return of a child, that the child has been

wrongfully removed or retained within the meaning of the
Convention." Id. § 11603(e)(1)(A) (formatting altered).

C.   Under Article 3 of the Hague Convention:

The removal or retention of a child is to be considered
wrongful where--

a.  it is in breach of rights of custody attributed to
a person . . . , either jointly or alone, under the law
of the State in which the child was habitually resident
immediately before the removal or retention; and

b.  at the time of the removal or retention those
rights were actually exercised, either jointly or
alone, or would have been so exercised but for the
removal or retention.

Hague Convention, Art. 3.

D.   As Thompson acknowledges, to prevail on her claim

seeking J.G.'s return under Article 3, she must show by a

preponderance of the evidence "(1) that [J.G.]'s habitual

residence was [Canada] immediately prior to the retention,

(2) that [she] had custody rights over [J.G.] at the time, and

(3) that [she] was exercising those rights." Nicolson, 605 F.3d

at 103.  Here, Thompson argues that Gnirk's "retention" of J.G.

began on August 25, 2011, when the British Columbia court issued

its initial order awarding Thompson interim sole custody of her.

While Gnirk disputes that Thompson was actually exercising her

custody rights at that time--he argues that she had effectively

abandoned custody of J.G. to him by then--the crucial issue in

dispute in this case is whether J.G.'s habitual residence was

Canada or the United States as of August 25, 2011.

E.   "The Hague Convention does not define 'habitual residence,' but the majority of federal circuits to consider it have adopted an approach that begins with the parents' shared intent or settled purpose regarding their child's residence." Id. at 103-04 (footnote omitted).  As Thompson herself argues in her proposed findings and rulings, "this inquiry should be guided by an 'objective observer' standard.  Therefore, the objective manifestations of parental intent . . . should trump any subsequent, subjective arguments" (quoting Nicolson, 605 F.3d at 104).  The court agrees with this view of the law.  See, e.g., Gitter v. Gitter, 396 F.3d 124, 134 (2d Cir. 2005) (holding that, in deciding the parents' intended residence for the child under the Hague Convention, "the court should look, as always in determining intent, at actions as well as declarations").  Here, though, the "objective manifestations of parental intent" point overwhelmingly to the conclusion that the parties' shared intent, at least until their romantic relationship ended in May 2011, was that J.G. reside in the United States.

F.   By the time Thompson and J.G. first traveled to the United States, in December 2009, Thompson and Gnirk had been living together since shortly after they first met in February 2007.  This includes, of course, the ten or so months they had lived together with J.G. after she was born.  The first time this period of cohabitation was interrupted, at least for any

significant duration, was when Gnirk returned to his native New England to try to find work in October 2009.  It is undisputed that Thompson and Gnirk had agreed on this course of action in advance, and that Gnirk's earning potential was the family's only realistic shot at long-term financial survival.  Shortly after Gnirk returned to New England, he secured a managerial position at a car dealership, the very type of job that had eluded him for the prior fifteen months or so in Canada.  In light of this history, an objective observer would have to conclude that, when Thompson and J.G. subsequently traveled to the United States and began living with Gnirk in early December 2009, it was the parties' shared intent that they reside--together with J.G., of course--in this country together as a family.

G.   This conclusion finds further support in the parties' actions after Thompson and J.G. arrived in the United States. Within six months or so, Thompson and Gnirk had co-signed a lease for an apartment in Maine and the family had moved in there together.  Thompson proceeded to select and purchase furniture for this apartment, including for J.G.'s room, and, as she acknowledged in her testimony, otherwise "set it up to make it a home."  Furthermore, when Gnirk's employer later transferred him from its dealership in Maine to its dealership in New Hampshire in March 2011, the family moved to New Hampshire together, initially living in a motel while looking for more suitable

housing.  By the middle of that month, Thompson and Gnirk had co-
signed an 18-month lease, with an option to purchase, for a house
in New Hampshire.  After moving in all of the furniture and other
belongings from the Maine apartment, the parties repainted nearly
the whole house.  They also held themselves out, and referred to
each other, as husband and wife (though they were not married,
they had, by Thompson's account, been engaged since August 2008,
and she had signed them up for a wedding registry with an
American retailer after moving to the United States).

        H.    As a leading case on the concept of habitual residence
has observed, courts "[m]ost commonly" conclude "that the family
as a unit has manifested a settled purpose to change habitual
residence . . . when both parents and the child translocate
together under circumstances suggesting that they intend to make
their home in the new country."  Mozes v. Mozes, 239 F.3d 1067,
1076-77 (9th Cir. 2001).  The circumstances just outlined
strongly suggest--if not outright compel--that conclusion here.
Indeed, Thompson and Gnirk "did what parents intent on making a
new home for themselves and their child do," including finding
stable employment and housing in the place where they moved.
Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995); see also
Koch v. Koch, 450 F.3d 703, 714 (7th Cir. 2006) (upholding
finding that children's habitual residence was Germany where "the
entire family moved to Germany because that is where [the father]

found work.  They took all of their possessions except for a few
large items and established a life in Germany where [the father]
worked and [the mother] cared for the children").

I.   In addition to this strong circumstantial evidence that
the parties intended for J.G. to reside in the United States,
there is also direct evidence to that effect.  Gnirk testified
that he and Thompson had discussed in advance that, after he
moved to Maine, she and J.G. would join him there "to start a new
life, get a home, settle down."  The court credits this testimony
not only because it makes sense in light of the parties'
situation in Canada prior to the move and their actions in the
United States afterwards, but also because Thompson--who, again,
has the burden of proving that J.G.'s habitual residence was
Canada--has not come forward with any plausible theory of what
else the parties could possibly have been planning.  See ¶ 10,
supra.  Again, she claimed that the parties intended that she and
J.G. remain in Canada and occasionally visit Gnirk in the United
States until he could return to Canada, but it is not clear how
that would have been possible in light of Gnirk's lack of job
prospects or legal immigration status in Canada.  Moreover, there
is no credible evidence that the parties did anything to put such
a plan into effect at any point after moving to the United
States.  To the contrary, as just discussed, nearly everything

they did manifested their shared intentions that J.G. reside, together with her parents, in the United States.

J.   Perhaps Thompson never stopped subjectively thinking of British Columbia as her "home," or even her daughter's "home." After all, Thompson grew up there, her parents, sister, and extended family lived there, and J.G. was born there.  Perhaps she even subjectively thought of the time she and J.G. spent with Gnirk in the United States as "visits."  Again, everything but Thompson's trial testimony suggests that she did not in fact see things that way, at least contemporaneously, see supra at ¶¶ 21-25, but, as she acknowledges, her subjective feelings as to where J.G. was living carry little if any weight in the habitual residence analysis in any event, see ¶ E, supra.

K.   Indeed, the court of appeals has squarely rejected the notion that, "if [one parent] were credited with a fixed subjective intent to take her daughter permanently to [one country], then all other circumstances would be irrelevant" in deciding habitual residence, because "'[s]tanding alone, of course, [one parent's] intent that the child should one day live in [that country] cannot support a finding of habitual residence.'"  Nicolson, 605 F.3d at 105 (quoting Ruiz v. Tenorio, 392 F.3d 1247, 1253 n.4 (11th Cir. 2004)).  Instead, as Thompson also acknowledges, whether the parents have arrived at a settled intent as to the child's habitual residence "should be guided by

an objective observer standard." See ¶ E, supra. Based on the facts and circumstances just discussed, any objective observer would have to conclude that, in early December 2009, Thompson and J.G. had moved to the United States to live with Gnirk, and continued living there with him until late May 2011--a situation that clearly reflects the parties' settled intent that J.G. reside in the United States with her family as a unit.

L.   It is true, as Thompson emphasizes, that the parties never sought legal immigration status in the United States for either her or for J.G., both of whom are Canadian citizens.[12] While some courts have treated this fact as tending to negate any shared intent for the child to reside in the country in question, see, e.g., Ruiz, 392 F.3d at 1256, none appears to have relied exclusively on the child's (let alone a parent's) lack of legal status in a country to reject it as the child's habitual residence, and that fact certainly cannot bear such significance here.  To the contrary, it is reasonable to infer that the parties never sought lawful permanent residency or citizenship in the United States for Thompson or J.G. because they were

---

[12]Thompson also emphasized that she never filed a tax return in the United States, but did file in Canada for both the 2009 and 2010 tax years.  This is unsurprising, considering that Thompson--who was a full-time mother during that time--did not report any income on those returns aside from benefits from the Canadian government, but, in any event, the court is at a loss to see what Thompson's filings of Canadian tax returns says about the intended residence of J.G.

preoccupied with the day-to-day issues that preoccupy many young
working families, such as employment, housing, and financial
stability, and not because they never intended that J.G. should
habitually reside in the United States.[13]

M.    Thompson also argues that, prior to the move to the
United States in December 2009, J.G.'s habitual residence was
Canada, so that the court can find that her habitual residence
later became the United States only if the "objective facts point
unequivocally to a new habitual residence."  As support for this
view of the law, Thompson relies on a statement from the Eleventh
Circuit's decision in Ruiz, with which she claims the First
Circuit has said, in Nicolson, it is "in accord."  There are
several problems with this argument.

N.    First, Nicolson does not say that it is "in accord"
with this aspect (or claimed aspect) of Ruiz.  Instead, Nicolson
states that "Ruiz accords with our own view that the law is less
rigid than [the respondent in that case] assume[d] and that tests
of habitual residence must be applied to the circumstances of the

---

[13]It is important to note that courts have considered a
child's immigration status as part of the habitual residence
inquiry because of what it says about the parents' intent on that
score, rather than because the Hague Convention expresses any
preference for returning children to their countries of
citizenship (as opposed to habitual residence) in cases of
international custody disputes.  Thus, the testimony of Elizabeth
May, a member of the Canadian Parliament whom Thompson called as
a witness at trial, that "the substance of this case is basically
the wrongful retention of a Canadian citizen" was not only wildly
improper, but legally immaterial (if politically prudent).

case." 605 F.3d at 105 (footnote omitted).  It is difficult to
read this statement as an endorsement of the very sort of rigid
test that this court understands Thompson to propose, i.e., so
long as a child was habitually resident in some other country at
some prior point--irrespective, it would appear, of how long ago
that was at the time of the alleged abduction or retention--a new
habitual residence can be shown only by "unequivocal" evidence.[14]

O.   Second, Ruiz does not stand for that proposition
anyway.  Ruiz says "that <u>when there is no shared settled intent</u>
<u>on the part of the parents to abandon the child's prior habitual</u>
<u>residence</u>, a court should find a change in habitual residence if
the objective facts point unequivocally to a new habitual
residence." 392 F.3d at 1254 (discussing Mozes, 239 F.3d at
1081) (emphasis added).  Here, for the reasons just discussed at
length, the court finds that the parties had the "shared settled
intent" to abandon J.G.'s habitual residence in Canada and move
her habitual residence to the United States (even assuming,

_____

[14]Indeed, this view of the law would appear inconsistent with
42 U.S.C. § 11603(e)(1)(A) which, as already discussed, requires
a petitioner to show, and to show by a preponderance of the
evidence, that the child has been wrongfully removed or retained
under the Hague Convention, including that the child's habitual
residence was elsewhere at that time.  See ¶¶ B-C, supra.  Under
Thompson's view, a respondent could raise the petitioner's burden
to "unequivocal" proof--or, as would seem to be the effect of
adopting Thompson's view in this case, a petitioner could shift
the burden of persuasion to the respondent on the issue of
habitual residence at the time of the wrongful removal or
retention--merely by showing that the child was habitually
resident in a different country during some prior period.

without deciding, that the parties had previously formed a shared
settled intent that J.G. reside in Canada, a point on which there
was conflicting trial testimony and circumstantial evidence that
is ambiguous at best, see ¶ 7, supra).  Ruiz, then, does not
support Thompson's view that J.G.'s habitual residence was
Canada, rather than the United States, at the time of Gnirk's
alleged wrongful retention of her on August 25, 2011.[15]

P.   Prior to that point, of course, J.G. had briefly
traveled to Canada with Thompson, following the dissolution of
the parties' romantic and cohabitative relationship in late May
2011.  But "the mere fact that conflict has developed between the
parents does not ipso facto disestablish a child's habitual
residence, once it has come into existence." Delvoye v. Lee, 329
F.3d 330, 333 (3d Cir. 2003).  To the contrary, to show that

---

[15]Whether the parties have reached a shared, settled intent
for their child's habitual residence prior to the alleged
wrongful abduction or retention is a different question, of
course, from whether they agree at trial on what the child's
habitual residence was at the relevant time.  See Mozes, 239 F.3d
at 1076 ("Difficulty arises . . . when the persons entitled to
fix the child's habitual residence no longer agree on where it
has been fixed . . . .  In these cases, . . . courts must
determine from all available evidence whether the parent
petitioning for return of the child has already agreed to the
child's taking up habitual residence where it is.").  Contrary to
Thompson's suggestion, then, the fact that the parties disagreed
at trial on J.G.'s habitual residence at the time of the alleged
wrongful retention does not mean that the court could resolve
that issue in Gnirk's favor only if the evidence was
"unequivocally" in that direction.  Again, such an approach would
plainly contradict the statutory allocation of both the burden
and quantum of proof.  See note 14, supra.

Canada became J.G.'s new habitual residence following the
parties' breakup in May 2011, Thompson would have to show by a
preponderance of the evidence--according to the very standard
that she advances--either a "shared settled intent on the part of
the parents to abandon the child's prior habitual residence" or
that the "objective facts point unequivocally to a new habitual
residence." Ruiz, 392 F.3d at 1254 .[16]

     P.   For the reasons discussed <u>supra</u> at ¶¶ 27-41, the court
cannot find, by a preponderance of the evidence, that, following
the end of the parties' romantic relationship in May 2011, they
ever shared any "settled intent" that J.G. reside in Canada going
forward.  To the contrary, the court finds that the parties had
not decided where J.G. would live in the future, either before
Thompson and J.G. traveled to Canada on May 26, 2011, <u>see</u> ¶ 30,
<u>supra</u>, or before Thompson transferred J.G. to Gnirk on June 26,
2011, <u>see</u> ¶¶ 30-34, <u>supra</u>.  Nor can the court find
"unequivocally"--or, for that matter, by a preponderance of the

---

    [16]<u>Ruiz</u> held that, in the absence of shared settled intent to
abandon a prior habitual residence, or unequivocal objective
evidence of a new habitual residence, a court can still find a
new habitual residence if it "could 'say with confidence that the
child's relative attachments to the two countries have changed to
the point where requiring a return to the original forum would
now be tantamount to taking the child out of the family and
social environment in which its life has developed.'" 392 F.3d
at 1254 (quoting Mozes, 239 F.3d at 1081 (further quotation marks
omitted)).  The court cannot say that J.G.'s "relative
attachments to the two countries" changed so dramatically as a
result of the month or so she spent in Canada in 2011, and
Thompson does not argue otherwise.

evidence--that J.G.'s habitual residence became Canada as of May 26, 2011.  To the contrary, J.G. had spent only about a month there before returning to New Hampshire in late June 2011.

Q.   As Thompson acknowledges, deciding a child's habitual residence under the Hague Convention is usually a "task to determine the intentions of the parties as of the last time their intentions were shared." Gitter, 396 F.3d at 134.  As just discussed, the parties did not share an intent to transfer J.G.'s habitual residence to Canada at any point after they had settled on an intent that she habitually reside in the United States.  It follows that the last time the parties shared an intent that J.G. habitually reside in any country, it was the United States.

R.   Finally, there is no merit to Thompson's argument, raised for the first time in her counsel's summation at the close of trial, that J.G.'s habitual residence reverted to Canada when the parties' romantic relationship ended because it marked the end of a "trial period" where they were "trying to make the relationship work."  It is true that some courts have found that, under such circumstances, a family's move to a different country does not reflect their "shared settled intent" that it serve as their habitual residence going forward.  See Ruiz, 392 F.3d at 1258-59; Mikovic v. Mikovic, 541 F. Supp. 2d 1264, 1281 (M.D. Fla. 2007).  Unlike in those cases, however, there is no evidence here that Thompson "agreed to move to [the United States] and

that [Gnirk] had promised her that if things did not work out, she could [go] back to" Canada.  Mikovic, 541 F. Supp. 2d at 1281 (citing Ruiz, 392 F.3d at 1258-59)).

S.   Indeed, Thompson never testified to even her own understanding of the time she and J.G. spent living with Gnirk in the United States as a "trial period" such that they would return to Canada if Thompson's relationship with Gnirk failed--let alone that Gnirk had "promised her" she and J.G. could do so "if things did not work out."  To the contrary, as already discussed at length, Thompson testified (against the overwhelming weight of the objective evidence) that the periods she and J.G. spent with Gnirk in the United States were merely "visits," such that Thompson had never agreed to "move" to the United States at all. Furthermore, there was no evidence that Thompson and Gnirk, unlike the unhappy couples in Ruiz and Mikovic, were experiencing difficulties in their relationship around the time they moved to the United States such that they even had occasion to discuss what they would do "if things did not work out" between them. Happy couples ordinarily do not make "contingency plans" for matters such as the custody of their children just in case the parents happen to split and, again, there is no evidence whatsoever that the parties did so here.  In light of this inarguable reality, Gnirk testified quite credibly, when he was asked on cross-examination whether "when [he] moved to the United

States [he] assume[d] that if [he] broke up with [Thompson] that [J.G.] would return to Canada," that he "didn't really assume that we would break up.  We were fine.  I didn't put any thought into what would happen if we broke up."

T.   When confronted with this utter lack of evidence for his "trial period" theory, counsel for Thompson pointed to the fact that, when the parties did in fact break up, Thompson and J.G. returned to Canada.  The fallacy in this argument is obvious:  the mere fact that parties take some action upon the happening of an event does not prove a previous agreement to take that action upon the happening of that event.  Even putting that aside, however, the court has already found that J.G.'s travel to Canada in May 2011 did not reflect any agreement the parties reached <u>after</u> they broke up that J.G. reside in Canada habitually, <u>see</u> ¶ 30, <u>supra</u>, so it would seem impossible to conclude that the parties had reached such an agreement even <u>before</u> they split.  It bears repeating that, even if Thompson's "subjective intent" was that she would return to Canada with J.G. to live if the parties' relationship ended--and, again, she never testified to having such an intent--that still would not show that J.G.'s habitual residence was Canada.  <u>See</u> ¶ K, <u>supra</u>; <u>see also</u> <u>Feder</u>, 63 F.3d at 224 ("That Mrs. Feder did not intend to remain in Australia permanently and believed that she would leave if her marriage did not improve does not void the couple's

settled purpose to live as a family in the place where Mr. Feder
had found work.")

U.   Accordingly, the court finds and rules that, as of
Gnirk's allegedly wrongful retention of J.G. on August 25, 2011,
J.G. was habitually resident in the United States.  It follows
that Thompson has not carried her burden of proof for relief
under Article 3 of the Hague Convention.  See ¶ D, supra.

V.   In reaching this conclusion, the court has repeatedly
found that Thompson's testimony was not credible, both as to
larger matters such as whether she was simply "visiting" the
United States and as to more minute details.  The court stresses
that it does not view Thompson as an inherently untrustworthy
person, or as a witness bent on misleading the trier of fact.
Instead, the court suspects that Thompson, like many parties who
testify on their own behalf--particularly those who bear the
burden of proof--was struggling to square prior events, including
her own behavior, with the necessary showing (in this case, that
she and Gnirk never shared an intent for J.G. to reside anywhere
but Canada).  This tendency is even more understandable in light
of the very high stakes of this particular proceeding.  The court
wishes to emphasize that, consistent with the limited inquiry
here, it has no opinion on either party's fitness as a parent,
whether as a result of credibility as a witness or otherwise.

## **Order for Judgment**

The clerk of court shall enter judgment for Gnirk and close the case.  Gnirk's motion to dismiss[17] is DENIED as moot.  Gnirk asks for payment of his "costs, including reasonable attorney's fees," but he does not offer any basis on which the court can award him attorneys' fees.  While 42 U.S.C. § 11607(b)(3) directs that "[a]ny court ordering the return of a child pursuant to [§ 11603] shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs [and] legal fees," it makes no such provision for a prevailing respondent like Gnirk.  Gnirk's request for attorneys' fees is therefore denied.  He may, however, seek his other costs in accordance with Rule 54(d)(1) of the Federal Rules of Civil Procedure and Local Rule 54.1.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: August 21, 2012

cc:  Christopher G. Green, Esq.
     Cori A. Lable, Esq.
     Edward K. Sebelius, Esq.
     Kristen A. Fiore, Esq.
     Lauren A. Graber, Esq.
     David P. Eby, Esq.
     Heidi A. Ames, Esq.

---

[17]Document no. 19.